UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO.  3:18-CV-151-RGJ-CHL

B.L., et al.,                                                                              Plaintiffs,

v.

BRADLEY SCHUHMANN, et al.,                                                Defendants.

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiffs' Motion to Compel Production of Documents of Dickinson

Wright, PLLC.   (DN 499.)   Defendant City of Louisville, Jefferson County/Louisville

Consolidated Government ("Louisville Metro") filed a response (DN 523), and Plaintiffs filed a

reply (DN 536).  The Court granted Louisville Metro leave to file a surreply.  (DNs 561, 563.)

The Court then directed Louisville Metro to submit the documents in question for an *in camera*

review.  (DN 567.)  Louisville Metro did so as directed (DN 575), and the Court has now reviewed

the documents at issue.  Therefore, this matter is ripe for review.

For the reasons set forth below, Plaintiffs' Motion to Compel Production of Documents of

Dickinson Wright, PLLC (DN 499) is **GRANTED**.

## I.     BACKGROUND

These matters arise from Plaintiffs' allegations of sexual abuse while participating in the

Louisville Metro Police Department ("LMPD") Explorer Program.  Only nine days after the filing

of the first complaint in these consolidated actions in Jefferson Circuit Court, Louisville Metro

retained the law firm of Dickinson Wright, PLCC ("Dickinson Wright") and former United States

Attorney Kerry Harvey ("Harvey") to conduct an investigation into the Explorer Program.  (DN

523, at PageID # 10,662; DN 499, at PageID # 10,249.)  Regarding hiring Harvey and Dickinson

Wright, Louisville Mayor, Greg Fischer ("Fischer"), said, "We have to get to the bottom of these disturbing allegations—for ourselves, for our citizens, for the thousands of LMPD officers who are honest, compassionate, courageous people of integrity . . . We need to know the truth. . . . We have to get the whole story—and we will." (DN 499-2, at PageID # 10,265.)  Regarding Harvey specifically, Fischer said, "Harvey has a reputation for conducting dogged investigations and holding public institutions accountable . . . That's exactly what I expect he'll do here—conduct a full, comprehensive investigation that will lead to accountability." (*Id.*)

According to the agreement between Dickinson Wright and Louisville Metro, which was adopted by a Metro Council resolution dated April 13, 2017, (the "Agreement"), Louisville Metro was "in need of certain professional services with respect to matters related to the LMPD Explorer Program" that Louisville Metro determined Dickinson Wright had "the necessary experience, expertise and qualifications to provide . . . ." (DN 536-1, at PageID # 10,795.)[1]  In describing the services Dickinson Wright was being hired to perform, the Agreement stated,

> The sen/ices [*sic*] of [Dickinson Wright] shall include but not be limited to . . . a full non-criminal investigation into the LMPD Explorer Program which investigation shall cover:
>
> 1.   a review of internal process, policies and procedures concerning the Explorer Program; and
> 2.   a review of whether any employment laws may have been violated; and
> 3.   a review of whether any ethics laws may have been violated; and
> 4.   the sufficiency of the checks and balances within LMPD professional standards and professional integrity components; and
> 5.   a timeline showing when information or accusations were first known, to whom same were reported, as well as subsequent actions and whether such actions followed Metro practices and policies.

---

[1] Louisville Metro attached only a portion of the Agreement to its response (DN 523-1) noting therein that it had attached only the relevant excerpts from the Agreement "[c]onsistent with the [Agreement]'s production as a 'Confidential' document . . . ." (DN 523, at PageID # 10,662 n.1.)  It is unclear to the Court what legitimate basis Louisville Metro could articulate for designating as confidential a publicly-available document that was attached to a Metro Council resolution, as Plaintiffs noted when they attached the entire agreement to their reply. (DN 536, at PageID # 10,781.)  Indeed, the entire Agreement was previously filed with the Court by former counsel for Louisville Metro as an attachment to Louisville Metro's initial Motion to Quash (DN 390). (DN 390-2.)

(*Id.* at 10,796.)  The Agreement provided that Dickinson Wright would produce a final findings "report" to "be presented to the Office the Mayor, the Metro Council President Pro Tem and the chairs of two largest Metro Council caucuses."  (*Id.* at 10,796.)  The Agreement stated that Dickinson Wright would "at all times be treated as an *independent investigator* . . ." and would "not be required to report on the progress of the investigation until . . ." it issued its report.  (*Id.* at 10,796-97.)  The Agreement required Louisville Metro to provide Dickinson Wright "with complete access to all documents and personnel necessary to conduct a thorough and complete investigation." (*Id.* at 10,797.) Further, the Agreement stated, "[Dickinson Wright] agrees that, if during the course of providing services under this Agreement, [Dickinson Wright] discovers information which [it] reasonably suspects may indicate criminal activity occurred, [it] shall immediately report that information to the appropriate law enforcement agencies." (*Id.* at 10,796.)

The Agreement incorporated Dickinson Wright's engagement letter, attached as Attachment A to the Agreement, within its description of the services to be performed. (*Id.* at 10,807.)  The engagement letter stated that Dickinson Wright had been selected to represent Louisville Metro "in connection with matters related to the Explorer program." (*Id.*)  It also stated that Dickinson Wright "would do [its] best to ensure that [Louisville Metro] [was] provided with timely legal advice." (*Id.*)  Further, it incorporated a series of standard terms of engagement, which provided in relevant part that the services provided by Dickinson Wright "may be varied by agreement during the course of the matter" and that if Louisville Metro had "any questions about how [Dickinson Wright's] legal services w[ould] be provided . . .," Louisville Metro should "contact a member of the Firm promptly." (*Id.* at 10,809.)

At the July 18, 2018 meeting of the Metro Council's Public Safety Committee (the "Committee"), over a year after Harvey and Dickinson Wright were hired regarding the

Committee's review of the final report, Harvey spoke extensively regarding the scope of the investigation and his work.[2]  (DN 499, at PageID # 10,252-54; DN 499-4.)  In response to questions from the Committee Chair, Council Member Jessica Green, Harvey said,

| | |
|---|---|
| Council Member Green: | . . . How did you all come to be involved in this investigation? |
| Harvey: | I think I was initially in uh, March of 2017, I don't recall the date, but I was contacted by uh, Ellen Hessen, uh, who briefly outlined the um, circumstances that were known at that time. Uh, there was an interest in what our law firm might be able to do to assist the Metro Government in terms of uh, um, looking into this matter to determine uh, if-what- if any failures existed in the Metro Government's response to this matter. |

. . .

| | |
|---|---|
| Council Member Green: | And what was the initial scope of what the investigation was supposed to be looking into? |
| Harvey: | I- I think primarily it was to- to take the facts that were known and to develop the facts and try to make some assessment uh, not about the guilt or innocence of the uh, police officers who had been indicted at this point, but about the response of the Metro Government uh, specifically but not limited to uh, the LMPD chain of command, to these occurrences uh, in order to determine uh, if there were deficiencies. |

(DN 499-4, at PageID # 10,273-74; Hearing Video, at 09:23-10:11, 11:07-11:48.)  Harvey testified that what he tried to do was "look at the response of the Metro Government to pull together all the information so that – that was available to [him], in a form that would be useful to the uh, leadership

---

[2] Plaintiffs submitted for the Court's consideration a transcript of the Committee hearing that had been created using the web-based service "Rev.com."  (DN 499-4.)  In reviewing the same, the Court noticed several errors that likely would not have existed in a transcript completed by a certified court reporter.  Because of these mistakes, the Court has reviewed the publicly-available video of the Committee hearing to verify that all quotes from the same in the instant opinion are accurate.  *Louisville Metro Council Public Safety Committee July 18, 2018, Special Session* (Jul. 18, 2018), http://louisville.granicus.com/MediaPlayer.php?view_id=2&clip_id=5651 [hereinafter "Hearing Video"].

of the Metro Government and to make whatever judgments [he] could about the uh, quality of the response to these unfortunate circumstances." (DN 499-4, at PageID # 10,277; Hearing Video, at 18:26-18:50.) In response to questions from several Council Members about his participation in a March 2017 meeting with a fact witness and county attorneys, Harvey repeatedly testified that he did not participate in "crafting a defense for the city" and that he "never saw [his] role as crafting a defense for anyone." (DN 499-4, at PageID # 10,281-82; Hearing Video, at 32:17-35:05.) He stated that his "role was to give the unvarnished facts as [he] found them and to give [his] unvarnished professional judgment about what [he] could conclude from those facts." (DN 499-4, at PageID # 10,282; Hearing Video, at 34:51-35:02.) He emphasized that his "role was not to in any way, shape or form assist the city with providing a defense or crafting a defense." (DN 499-4, at PageID # 10,286; Hearing Video, at 40;14-24.) In response to questions from Council Member Barbara Sexton-Smith, he said

| | |
|---|---|
| Council Member Sexton-Smith: | . . . Have you participated in any way at any time in evaluating the defense? |
| Harvey: | No, ma'am. |
| | |
| Council Member Sexton-Smith: | And have you been asked to do that? |
| Harvey: | No, ma'am. |
| Council Member Sexton-Smith: | Do you feel that you've done anything at any time and offered your opinions and views, uh, toward the defense for the Louisville Metro Government? |
| Harvey: | I, I don't think so, no. To a certain extent, some of these issues and the facts are intertwined. But I've, you know, I've don't . . . I've not participated in defending the city in the civil suit. |

(DN 499-4, at PageID # 10,283; Hearing Video, at 35:15-35:48.)  However, he did make clear during his comments that he believed attorney-client privilege was still applicable to his work and that he had given Upjohn warnings to the witnesses that were interviewed.[3]  (DN 499-4, at PageID # 10,300, 10,329, 10,339; Hearing Video, at 1:08:28-1:10:48, 2:04:56-2:05:33, 2:29:10-2:29:30.)

Dickinson Wright's final report (the "Report") was labeled "confidential" and "attorney-client privileged."[4]  (DNs 523-5, at PageID # 10,691; 564-1, at PageID # 11,707.)  The Report stated that "Dickinson Wright, acting as attorneys for the Louisville Metro Government conducted an objective internal review . . . " to satisfy the objectives listed by Louisville Metro in the Agreement.  (DN 564-1, at PageID # 11,711.)  The Report indicated that Dickinson Wright's "inquiry sought to document the events and the responses to those events as well as make judgments, where appropriate concerning errors made along the way." (*Id.* at 11,712.)  Dickinson Wright also stated in the Report that "the investigative team's purpose [wa]s to identify when senior command became aware of the alleged misconduct and document LMPD's response to the allegations," as well as to "offer[ ] an assessment of the Explorer program and subsequent . . . investigations for the purpose of avoiding similar issues in the future." (*Id.* at 11,766.)  The Report contained background information on both the Explorer Program and LMPD, as well as a summary

---

[3] In *Upjohn Co. v. United States*, 499 U.S. 383, 394 (1981), the Supreme Court found that investigations by counsel can trigger the protections of the attorney-client privilege.  In the wake of the *Upjohn* decision and based on the Court's analysis therein, corporate attorneys often provide employees being interviewed so-called *Upjohn* warnings that may include an admonition that the attorney represents the corporation not the individual, the interview is a privileged conversation, and the corporation controls its own attorney-client. *See, e.g.*, Timothy M. Middleton, *"Watered-Down Warnings": The Legal and Ethical Requirements of Corporate Attorneys in Providing Employees with "Upjohn Warnings" in Internal Investigations*, 21 Geo. J. Legal Ethics 951, 951-52 (2008).

[4] Louisville Metro initially attached "excerpts" of the redacted Report to its response.  (DN 523-5.)  It appears that the Report was labeled "confidential" at the bottom in the center of each page, though it is unclear if the same was done at the time the Report was developed or at Louisville Metro's counsel's request as part of this litigation.  However, the entirety of the redacted Report is publicly available on the internet.  Dickinson Wright, *Louisville Metro Police Department Explorer Program Internal Investigation Final Report*, Louisville Metro Government Agenda & Meeting Portal (June 27, 2018), https://louisville.legistar.com/View.ashx?M=F&ID=6364348&GUID=6721D784-4450-4F33-A346-51C9C8D3A64C.  Because it was relevant to the instant motion, and because Louisville Metro cited in support to at least a portion of the Report in its response, the Court ordered Louisville Metro to file the entirety of the redacted report in the record.  (DN 561.)  Louisville Metro did so on June 29, 2020.  (DN 564-1.)

of the facts surrounding the alleged misconduct by Defendants Kenneth Betts and Brandon Wood and the subsequent investigations of the same.  (*Id.* at 11,708, 11,716-64.)  The Report then proceeded to offer an assessment of the previous investigation into the allegations, whether the policies and procedures of LMPD and the Boy Scouts were followed, and whether there was a cover up.  (*Id.* at 11,765-91.)  The Report made certain recommendations regarding continued operation of the Explorer Program and the Special Investigations Division.  (*Id.* at 11,792-99.) However, the recommendations in the Report were largely targeted at whether existing policies were followed or how changes to existing policies could prevent similar occurrences in the future, not whether those policies comported with any legal duties.

On November 25, 2019, Plaintiffs served a subpoena on Dickinson Wright for various documents related to Dickinson Wright's investigation.  (DN 499, at PageID # 10,250; DN 499-3.)  Louisville Metro initially filed a Motion for Protective Order related to the subpoena (DN 390), but the Court later denied the motion as moot because the Parties reported they had resolved the issue (DN 400).  The Parties agreed that counsel for Louisville Metro would facilitate the production of responsive documents.  (DN 499, at PageID # 10,250 n.2.)  Louisville Metro produced 6,086 pages of Dickinson Wright's file but served a privilege log upon Plaintiffs refusing to produce certain additional documents claiming the same were protected by attorney-client privilege and/or the work product doctrine.  (DN 523, at PageID # 10,664; DN 499-1.)  Plaintiffs then requested and were granted leave to file the instant motion.  (DN 472.)

Plaintiffs argued that none of the documents identified on Louisville Metro's privilege log are protected from disclosure because Dickinson Wright was not performing legal services.  (DN 499, at PageID # 10,250.)  Plaintiffs argued Dickinson Wright was instead providing business advice that is not protected by the attorney-client privilege.  (*Id.* at 10,253.)  They also argued that

none of Dickinson Wright's materials were prepared in anticipation of litigation or for trial because Dickinson Wright was not acting as attorneys but rather investigators/advisors.  (*Id.* at 10,255.) They likewise argued that Louisville Metro did not demonstrate that anticipated litigation was the reason for the preparation of the documents listed on the privilege log.  (*Id.* at 10,256.)

Louisville Metro argued that just because Dickinson Wright was not retained as litigation counsel did not mean it was not providing legal services protected by attorney-client privilege. (DN 523, at PageID # 10,666-67.)  Louisville Metro cited examples of cases where courts held that investigations like Dickinson Wright's were protected by attorney-client privilege.  (*Id.* at 10,667-68.)  Louisville Metro also argued that the timing of Dickinson Wright's retention shortly after the first complaint in these consolidated cases in state court "undermine[d] any claim that the documents were not prepared with an eye toward litigation."  (*Id.* at 10,671.)

In their reply, Plaintiffs emphasized that Louisville Metro had failed to meet its burden of demonstrating the documents listed on the privilege log were entitled to protection.  (DN 536, at PageID # 10,785-86.)  Plaintiffs argued that Louisville Metro's privilege log was not specific enough as to the identities of the listed individuals in terms of their "capacities, roles, or positions" and that the descriptions of the documents were likewise not specific enough.  (*Id.* at 10,788.) Plaintiffs also argued that communications initiated by Harvey and Dickinson Wright were not covered by attorney-client privilege.  (*Id.* at 10,789-90.)

Because it viewed Plaintiffs' reply as raising new arguments, Louisville Metro filed a motion for leave to file a surreply.  (DN 544.)  The Court granted the motion but required Louisville Metro to file a shorter surreply than previously tendered.  (DN 561.)  In its surreply, Louisville Metro argued that it had provided sufficient evidence to demonstrate the applicability of all elements of the attorney-client privilege.  (DN 563, at PageID # 11,686-98.)  It argued that it hired

Dickinson Wright to provide "legal advice regarding whether any laws were broken in the incidents at issue," which may only be given by a lawyer. (*Id.* at 11,687.)  It explicitly argued that the tasks listed in the Agreement were tasks for which "clients must retain attorneys . . . ." (*Id.* at 11,688.)  Louisville Metro also offered to submit an updated privilege log with additional information that addressed Plaintiffs' concerns regarding the roles of particular individuals had and the descriptions of the listed documents. (*Id.* at 11,698.)  It emphasized that it viewed the language of all pertinent documents to demonstrate that "Louisville Metro retained Dickinson Wright in anticipation of Plaintiffs' lawsuits." (*Id.* at 11,699.)

## II.     DISCUSSION

### A.     Attorney-Client Privilege

Louisville Metro claimed that various letters, memoranda, e-mails, invoices, and notes; a PowerPoint presentation; and the unredacted version of Harvey and Dickinson Wright's final Report were protected from disclosure by the attorney-client privilege. (DN 499-1.)  While no party requested that the Court do an *in camera* review of the listed documents to determine the validity of the privilege claimed, the Court concluded that review of the documents would assist in determining the issues before it. (DN 567.)  Having now reviewed both the Parties' submissions and the documents, the Court finds that the documents on the privilege log are not protected by the attorney-client privilege.

In a case before the Court on federal question jurisdiction, a claim of privilege is governed by federal law. *Hancock v. Dodson*, 958 F.2d 1367, 1373 (6th Cir. 1992); *Babcock Power, Inc. v. Kapsalis*, No. 3:13-cv-717-CRS,  2016 WL 1717225, at *2 (W.D. Ky. Apr. 28, 2016), *objections overruled*, 2016 WL 5478006, at *4 (W.D. Ky. Sept. 27, 2016).  This is true even when the case likewise contains pendent state law claims. *Hancock*, 958 F.2d at 1373 ("Since the instant case is

a federal question case by virtue of the appellant's section 1983 claim, we hold that the existence of pendent state law claims does not relieve us of our obligation to apply the federal law of privilege.").  The elements of a claim of attorney-client privilege under federal law are:

> (1) [w]here legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection is waived.

*Reed v. Baxter*, 134 F.3d 351, 355-56 (6th Cir. 1998) (citing *Fausek v. White*, 965 F.2d 126, 129 (6th Cir.1992)).  "The privilege's primary purpose is to encourage 'full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice,'" and courts should determine the scope of the privilege in light of this purpose.  *Ross v. City of Memphis*, 423 F.3d 596, 600 (6th Cir. 2005) (quoting *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998)).  The burden is on the person asserting the privilege to prove it applies.  *In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293 F.3d 289, 294 (6th Cir. 2002) (quoting *United States v. Dakota*, 197 F.3d 821, 825 (6th Cir.2000)).  Government entities and municipalities are entitled to assert the attorney-client privilege in civil proceedings.  *Ross*, 423 F.3d at 603; *Burkhead & Scott, Inc. v. City of Hopkinsville*, No. 5:12-CV-00198-TBR, 2014 WL 6751205, at *2 (W.D. Ky. Dec. 1, 2014).

Plaintiffs claimed that attorney-client privilege did not apply to the documents listed on Louisville Metro's privilege log because Harvey, Sparks, and Dickinson Wright were not retained to provide legal advice.  (DN 499, at PageID # 10,252.)  It is well established that "the attorney-client privilege may attach only if the communications regard legal advice."  *Reg'l Airport Auth. of Louisville v. LFG, LLC*, 460 F.3d 697, 713 (6th Cir. 2006).  In *Alomari v. Ohio Dep't of Public Safety*, 626 F. App'x 558, 570 (6th Cir. 2015), the Sixth Circuit cited with approval to a Second

Circuit decision regarding the definition of legal advice.   The Second Circuit explained, "Fundamentally, legal advice involves the interpretation and application of legal principles to guide future conduct or to assess past conduct."   *In re Cnty. of Erie*, 473 F.3d 413, 419 (2d Cir.2007).  Applying this principle, the Sixth Circuit indicated that

> [w]hen a communication involves both legal and non-legal matters, we "consider whether the predominant purpose of the communication is to render or solicit legal advice."  This predominant purpose "should be assessed dynamically and in light of the advice being sought or rendered, as well as the relationship between advice that can be rendered only by consulting the legal authorities and advice that can be given by a non-lawyer."

*Alomari*, 626 F. App'x at 570 (citations omitted) (quoting *In re Cnty. Of Erie*, 473 F.3d at 420-21).

Courts analyzing similar factual situations to the present have emphasized the importance of the terms of any engagement letter between the client and the investigator to determine the applicability of the privilege and whether legal advice was sought.  *See Sandra T.E. v. S. Berwyn Sch. Dist. 100*, 600 F.3d 612, 619 (7th Cir. 2010); *Doe 1 v. Baylor University*, 310 F.R.D. 430, 436 (W.D. Tex. 2017).  A close examination of the terms of the Agreement between Louisville Metro and Dickinson Wright demonstrates that Dickinson Wright was not retained to provide legal advice.  Though the Agreement referred repeatedly to Dickinson Wright as an "attorney," it indicated it was one for professional services, not legal services save for two references to legal advice and legal services in Dickinson Wright's fill-in-the-blank engagement letter and Standard Terms of Engagement.  (DN 536-1, PageID # 10,795, 10,807, 10,809.)  As the United States District Court for the Western District of Texas explained, "[T]here is no magic phrase that must be included in an engagement letter to invoke the attorney-client privilege."  *Doe 1*, 320 F.R.D. at 436.  Accordingly boiler-plate references to an attorney or legal services or the mere absence of

the same do not suffice as indicators of the true nature of the relationship between Louisville Metro and Dickinson Wright.  Instead, the Court looks at the Agreement as a whole.

The description of Dickinson Wright's services to be performed was not limited to the types of tasks generally performed by a lawyer but also included "a review of internal processes, policies and procedures concerning the Explorer Program"; "the sufficiency of checks and balances within LMPD professional standards and professional integrity components"; and "a timeline showing when information or accusations were first known, to whom the same were reported, as well as subsequent actions and whether such actions followed Metro practices and policies." (*Id.* at 10,796.)  While the judgment of an attorney may be helpful to these tasks, a lawyer's opinion is by no means required to determine whether conduct met the policies and procedures prescribed by particular organizations, nor are those policies and procedures themselves legal principles a lawyer's judgment is necessary to apply.  Further, the Agreement did not ask for a determination of whether those policies comported with any applicable laws or legal principles.  While the Agreement also called for Dickinson Wright to examine "whether any [unspecified] ethics laws may have violated," rules of ethics do not necessarily carry the force of law. (*Id.*)  Accordingly, this charge, like those previously discussed does not necessarily implicate a lawyer's judgment or a request for legal advice or the application of legal principles.

The final charge in the Agreement was for "a review of whether any employment laws may have been violated." (*Id.*)  This item, taken alone, would generally indicate a request for legal advice.  However, in the context of the remaining services and the other evidence submitted, the Court is not convinced this language is dispositive of the nature of Louisville Metro's requested services from Dickinson Wright.  Nor did the Court see any legal advice regarding applicable employment laws in the documents submitted for an *in camera* review.  In reaching this

conclusion, the Court is particularly persuaded by the provision of the Agreement that stated, "[Dickinson Wright] agrees that, if during the course of providing services under this Agreement, [Dickinson Wright] discovers information which [it] reasonably suspects may indicate criminal activity occurred, [it] shall immediately report that information to the appropriate law enforcement agencies." (*Id.* at 10,796.)  The Court finds this provision to be contrary to the conclusion that Louisville Metro intended Dickinson Wright to provide legal advice because of the dissonance between this provision and the duties of loyalty and confidentiality owed by an attorney to a client. When combined with the Agreement's emphasis that Dickinson Wright was to "at all times be treated as an independent investigator" and was to conduct "a full non-criminal investigation into the LMPD Explorer Program" and Mayor Fischer's comments at the time that Dickinson Wright was hired about the need for transparency and the truth, the Court finds the Agreement called for an independent assessment of the matter not legal advice as to how to handle it.

This reading of the Agreement is supported both by attorney Harvey's statements regarding the scope of his engagement and a reading of the final Report he produced.  As indicated above, Harvey repeatedly stated that he was not retained to develop a defense for Louisville Metro and was instead retained to provide his judgment about any deficiencies in Louisville Metro's response to the alleged events.  (DN 499-4, at PageID # 10,281-83, 10,286.)  The final Report itself chronicles Harvey's investigation, includes factual conclusions about what happened, and recommendations regarding policies to reduce the likelihood of those same events happening again. (DN 564-1.)  While some material is redacted, the redactions are minimal, and the redacted version of the Report was released to the public and discussed in a public session of the Louisville Metro Council Public Safety Committee.  Taking all these facts together, the Court concludes that the Agreement did not call for Dickinson Wright to provide legal services to Louisville Metro.  It

called for an independent factual inquiry and assessment of the relevant policies and procedures in place at the time including whether those procedures were followed and any changes to them that could be made to prevent those events from happening in the future, not necessarily any changes implicated by any particular law or legal principle or to avoid future legal liability. This task is not legal advice. And since Louisville Metro was not seeking legal advice, the attorney-client privilege does not protect the documents listed on the privilege log.

The Parties each rely on cases from other jurisdictions that they allege are dispositive of the instant issue. A closer review of those cases demonstrates they are distinguishable from the facts before the Court. Louisville Metro argued that *Sandra T.E. v. South. Berwyn School District 100* was factually analogous and dispositive of the instant case. In *Sandra T.E*, a school board hired attorneys from Sidley Austin "to conduct an internal investigation and provide legal advice to" the school board after a teacher was charged with molesting students and the victims brought a civil lawsuit. *Sandra T.E.*, 600 F.3d at 615. Sidley Austin interviewed employees and witnesses, took handwritten notes, and drafted memos summarizing the interviews, then "delivered its findings and legal advice to the School Board in an oral report and a written executive summary" at a closed session of the board. *Id.* When the plaintiffs in the civil case subpoenaed all the documents in Sidley Austin's possession, the firm declined to produce its notes and memos citing attorney-client privilege and the work product doctrine. *Id.* at 615-16. While the district court found that there was no privilege, relying on letters a school principal sent to parents about the district's desire to discover the truth, the Seventh Circuit reversed citing the importance of the engagement letter between the school board and Sidley Austin. *Id.* at 619. The engagement letter had stated that Sidley Austin "was to 'investigate the response of the school administration to allegations of sexual abuse of students' and to 'provide legal services in connection with' the

investigation." *Id.* at 616.  Citing the Supreme Court's decision in *Upjohn Co. v. United States*, the Seventh Circuit concluded that Sidley Austin had been hired in its capacity as a law firm to provide legal services, including a factual investigation, such that attorney-client privilege protected its notes and memoranda from disclosure.[5]  *Id.* at 620.  However, the engagement letter in the instant case is distinguishable from the engagement letter in *Sandra T.E.* because the instant Agreement involved different tasks and more specifically, tasks that did not explicitly request Dickinson Wright's legal services in connection therewith.

Louisville Metro argued because Dickinson Wright attorneys provided *Upjohn* warnings to interviewees prior to any interviews, the attorney-client privilege applied.  While the Seventh Circuit in *Sandra T.E.* did rely in part on the fact that Sidley Austin attorneys had provided *Upjohn* warnings, the Court does not read that fact as the linchpin of the Seventh Circuit's analysis.  Louisville Metro has provided no case law indicating that the use of *Upjohn* warnings is dispositive of whether the attorney-client privilege applied, nor is the Court aware of any.  Instead, while the Court recognizes that the use of the *Upjohn* warnings mitigates in favor of a conclusion that Louisville Metro was seeking legal advice, it does not overcome the other facts discussed above including the language of the Agreement by which Dickinson Wright was retained.

Plaintiffs relied upon *Wartell v. Purdue Univ.*, No. 1:13-cv-99-RLM-APR, 2014 WL 4261205 (N.D. Ind. Aug. 28, 2014), and *Doe v. Phillips Exeter Acadm.*, No. 16-cv-396-JL, 2016 WL 5947263, at *1 (D. N.H. Oct. 13, 2016), in support of their claim that Dickinson Wright was not retained to provide legal services.  Both *Wartell* and *Doe* are distinguishable from the instant case.  In *Wartell*, the United States District Court for the Northern District of Indiana found that attorney-client privilege did not apply to the investigation and report of an independent investigator

---

[5] As discussed *infra*, *Upjohn* is distinguishable from the instant case.

retained to investigate a dispute between a university president and chancellor. *Id.* at *7-8. However, there was no engagement letter before the *Wartell* court and the agreement between the University and the plaintiff regarding the investigation to be conducted is not similar to the instant case. *Id.* In *Doe v. Phillips Exter*, outside counsel for the school retained an attorney as an independent investigator to perform an investigation into allegations of student-on-student sexual assault. *Phillips Exeter*, 2016 WL 5947263, at *1. The court relied on the fact that the investigator's report consisted of largely factual findings of what happened, including credibility determinations on disputed issues. *Id.* at *3. The court noted that the school used the report to determine whether to suspend or expel a student and that "[a]dvice to a school on whether to discipline a student seem[ed] . . . to more closely resemble communications to facilitate a business decision than pursuit of legal advice." *Id.* While the *Phillips Exeter* court's focus on the content of the report provided is instructive of a way to analyze the instant case, this matter does not deal with school discipline. Accordingly, neither *Wartell* nor *Phillips Exeter* compels a particular result in the instant case.

However, comparison of the instant case to the case of *Doe 1 v. Baylor University* is instructive as to the proper application of the attorney-client privilege. In *Doe 1*, Baylor University hired the law firm Pepper Hamilton "to conduct an independent and external review of Baylor University's institutional responses to Title IX and related compliance issues through the lens of specific cases." *Doe 1*, 320 F.R.D. at 434. The parties later amended their engagement letter to confirm that Pepper Hamilton was hired "to provide legal advice and guidance to the University . . ." and that "all material prepared and communications made by Baylor University, Pepper [Hamilton], and their representatives in the course of the review are in anticipation of litigation and are privileged work product." *Id.* After Baylor released documents summarizing the results

of the investigation, the plaintiffs filed suit and sought production of documents provided to and produced by Pepper Hamilton. *Id.* Baylor objected on the basis of attorney-client privilege and the work product doctrine. *Id.* The court ultimately concluded that Baylor was seeking legal advice because the engagement letter retained Pepper Hamilton "to review its compliance with federal law—in other words, to obtain legal advice." *Id.* at 436. The court also cited in support to a declaration by a member of the Board of Regents that he and another regent had recommended law firms that "had the expertise to both conduct the needed factual investigation and advise the Board regarding potential liability arising out of the University's hand[l]ing of allegations of sexual assault and any other claims that could ensure, such as Title IX litigation, employment related litigation, regulatory investigations, or government enforcement proceedings." *Id.* The court found that plaintiffs had failed to distinguish the case from *Upjohn* and that "Baylor sought advice from Pepper Hamilton to better understand its legal obligations and liabilities—the exact sort of behavior the privilege seeks to encourage."[6] *Id.* at 437. Unlike *Doe 1*, the Agreement between Dickinson Wright and Louisville Metro did not seek advice about compliance with law. It sought a factual investigation into whether Louisville Metro and LMPD followed their own policies and ethical obligations to get to the truth about what happened and how it could be prevented from happening again. This is not legal advice. If, as in *Doe 1*, the scope of Dickinson Wright's engagement had been to review Louisville Metro's policies to prevent Louisville Metro from being sued again, that would have constituted legal advice. However, the Agreement and Dickinson Wright's final Report itself make clear that Louisville Metro was concerned with preventing future conduct not future litigation.

---

[6] While the *Doe 1* court went on to conclude that even though the attorney-client privilege applied, Baylor had waived its protections, this Court does not reach the issue of waiver.

Nor does an examination of *Upjohn* compel a different result.  In *Upjohn*, the company's attorneys conducted an internal investigation of "questionable payments" by foreign subsidiaries to foreign government officials.  *Upjohn*, 499 U.S. at 386-87.  The Supreme Court held that questionnaires submitted to the company's general counsel were protected by the attorney-client privilege because the communications and factual investigation were necessary to allow the lawyer to give sound and informed legal advice.  *Id.* at 390-91.  However, Dickinson Wright was not retained to develop a report on the tax implications of potential conduct or how to respond to a regulatory organization.  Accordingly, the interviews and work conducted by Dickinson Wright is different from that implicated in *Upjohn*.

Based on the above analysis, the Court concludes that Louisville Metro has failed to demonstrate it was seeking legal advice from an attorney in the attorney's capacity as such so as to trigger the attorney-client privilege as to any of the materials listed on the privilege log.  Because the Court concluded that Louisville Metro failed to demonstrate elements one and two of a claim for attorney-client privilege, the Court does not reach the remaining elements, including whether the attorney-client privilege has been waived by the public disclosure of materials related to Dickinson Wright's investigation.  However, because Louisville Metro also claimed the protection of the work product doctrine as to each purported attorney-client communication it listed, the Court will assess Louisville Metro's claim regarding the work product doctrine below.

## B.    Work Product Doctrine

Louisville Metro listed every item on its privilege log as being protected from disclosure by the work product doctrine, including those items it listed as protected by attorney-client privilege.  (DN 499-1.)  The items included memoranda, letters, outlines, emails, notes, invoices, a PowerPoint presentation, and the final, unredacted version of Dickinson Wright's Report.  (*Id.*)

The work product doctrine is governed by Fed. R. Civ. P. 26. *In re Powerhouse*, 441 F.3d at 472; *Pinnacle Sur. Servs. v. Manion Stigger, LLP*, 370 F. Supp.3d 745, 755 (W.D. Ky. 2019). The doctrine protects "documents and tangible things that are *prepared in anticipation of litigation or for trial* by or for another party or its representative . . . ." Fed. R. Civ. P. 26(b)(3)(A) (emphasis added). To determine whether a document was prepared in anticipation of litigation, the Court asks "(1) whether a document was created because of a party's subjective anticipation of litigation . . . and (2) whether that subjective anticipation of litigation was objectively reasonable." *United States v. Roxworthy*, 457 F.3d 590, 594 (6th Cir. 2006). "[A]n ordinary business purpose" does not suffice. *In re Prof'ls Direct Ins. Co.*, 578 F.3d 432, 439 (6th Cir. 2009). "[T]he burden is on the party claiming protection to show that anticipated litigation was the 'driving force behind the preparation of each requested document.' " *Id.* (quoting *Roxworthy*, 457 F.3d at 595); *see also Roxworthy*, 457 F.3d at 593 ("It is clear that documents prepared in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other nonlitigation purposes, are not covered by the work product privilege."). "So-called 'fact' work-product, the 'written or oral information transmitted to the attorney and recorded as conveyed by the client,' . . . may be obtained upon a showing of substantial need and inability to otherwise obtain without material hardship." *In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293 F.3d 289, 294 (6th Cir. 2002) (quoting *In re Antitrust Grand Jury*, 805 F.2d 155, 163 (6th Cir. 1986) and citing *Toledo Edison Co. v. G.A. Techs., Inc.*, 847 F.2d 335, 339-40 (6th Cir. 1988)). "However, absent waiver, a party may not obtain the 'opinion' work of his adversary; i.e., 'any material reflecting the attorney's mental impressions, opinions, conclusions, judgments, or legal theories.'" *Id.* (quoting *In re Antitrust Grand Jury*, 805 F.2d at 163-64).

The Court cannot conclude that the documents listed on the privilege log were prepared in anticipation of litigation given the facts set forth above, including the Court's analysis of the Agreement in reference to Louisville Metro's claim of attorney-client privilege.  Louisville Metro certainly had a reasonable subjective anticipation of litigation because the first Complaint in these consolidated actions was filed prior to Louisville Metro engaging Dickinson Wright.  However, the Court cannot conclude that Dickinson Wright was retained and that, therefore, any of the materials Dickinson Wright prepared were prepared *because of* that anticipation of litigation.  The Court has already found that Dickinson Wright was not retained to provide legal advice, and both that conclusion and the facts supporting it compel the additional conclusion that Dickinson Wright was likewise not retained to do an investigation of the facts in anticipation of litigation.  Harvey's repeated comments that he was not hired to defend or provide a defense for Louisville Metro in the civil suits counsel against this conclusion, as do the Mayor's comments at the time that Dickinson Wright was hired about the need for transparency and the truth.  The Court's review of the documents submitted for an *in camera* review does not alter this analysis.  Thus, it appears instead that Dickinson Wright was hired to assess Metro's policies and procedures and provide accountability to the community, not lay the factual groundwork for Louisville Metro's legal defense.  While a worthy pursuit, this does not trigger the protection of the work product doctrine.

Many of the same cases discussed above in the context of the attorney-client privilege also included a discussion of the applicability of the work product doctrine.  In *Sandra T.E.*, the Seventh Circuit rejected the plaintiff's claim the Sidley Austin's "investigation was only designed to quell public outrage and prevent similar occurrences in the future" as unsupported by the record.  *Sandra T.E.*, 600 F.3d at 622.  The court concluded that Sidley Austin was retained to investigate in response to the actual filing of a lawsuit in addition to those other motivations.  *Id.*  In *Doe 1*, the

court concluded that hiring Pepper Hamilton was not part of Baylor's routine practice "but was primarily motivated by its anticipation of litigation." *Doe 1*, 320 F.R.D. at 441. It found that declarations submitted by Baylor indicated that Baylor retained Pepper Hamilton in response to media reports that led it to anticipate litigation as well as potentially a government enforcement action. *Id.* Both the Seventh Circuit in *Sandra T.E.* and the Western District of Texas in *Doe 1* held that the work product doctrine applied. However, as above with those cases' analysis of attorney-client privilege, their holdings as to the application of the work product doctrine are distinguishable. While litigation against Louisville Metro had been filed, Harvey made perfectly clear his work had nothing to do with defending the city in that litigation. The factual content of the Report and the fact that the recommendations therein do not necessarily relate to any particular policy's compliance with law but rather the efficacy of the same in preventing future similar conduct weighs against Louisville Metro's argument that Dickinson Wright was retained because of anticipated litigation.

For these reasons, the Court concludes that Louisville Metro has failed to demonstrate that the Dickinson Wright documents listed on its privilege log were prepared in anticipation of litigation, and, thus, the same are not protected by the work product doctrine.

## III.   ORDER

For the reasons set forth above, IT IS HEREBY ORDERED that Plaintiffs' Motion to Compel Production of Documents of Dickinson Wright, PLLC (DN 499) is **GRANTED**. Louisville Metro is directed to produce all documents listed on its privilege log (DN 499-1) within **thirty days** of entry of this Memorandum Opinion and Order.

Colin H Lindsay, Magistrate Judge
United States District Court

cc:  Counsel of record

October 26, 2020